## PRUDENTIAL INSURANCE CO. v. ZAK.

No. 28892.    Sept. 26, 1939.

Rehearing Denied Oct. 24, 1939.

Arch M. Parmenter and C. T. O'Neal, for plaintiff in error.

E. L. Richardson and J. H. Cline, for defendant in error.

CORN, J.    Mayer Zak sued the Prudential Insurance Company of America on its policy of insurance on the life of his wife, Minnie Zak, for $1,000, and recovered judgment for that sum. The parties will be referred to herein as they appeared in the trial court.

The defendant contends: (1) The verdict and judgment are contrary to, and not supported by, the evidence; and are contrary to law; and (2) that the court committed error during the trial of the case by the admission of incompetent, irrelevant, and immaterial evidence on behalf of plaintiff, and by emphasizing plaintiff's theory of the case in its instructions and minimizing the defendant's theory of the case by ignoring it, and by refusing to give defendant's requested instructions.

The defendant contends under the first proposition that the statements contained in the application of the insured were warranties and not merely representations. The policy provides that all statements made by the insured shall, in the absence of fraud, be deemed representations and not warran-

ties. The defense was based upon alleged fraud of the insured in answering certain material questions contained in the application.

Under such provision in the policy it was encumbent upon the defendant to allege and prove fraud in order to give such statements the legal effect of warranties, and thereby void the policy. In the case of New York Life Insurance Co. v. Strong, 179 Okla. 280, 65 P.2d 194, the policy sued on contained a provision identical to the one above mentioned in the policy in this case, and this court in that case applied the rule universally followed in this jurisdiction with reference to representations and warranties, as follows:

"Where a life. insurance policy provides: 'All statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties, and no such statement shall avoid the policy or be used in defense to a claim under it, unless it be contained in the written application and a copy of the application is indorsed upon or attached to this policy when issued'—the statements by the insured are to be construed as representations and not warranties in the absence of fraud.

"Where a policy of life insurance provides that all statements made by the insured shall, in the absence of fraud, be construed as representations and not warranties, in order for misrepresentations made by the insured in an application to avail the insurer as a defense, it must show, not only that the statements were not true, but that they were willfully false, fraudulent, and misleading, and made in bad faith.

"Generally, the question of the falsity of the statements contained in a life or accident insurance policy and the intent of the applicant in making them is for the jury."

To establish fraud the defendant relies principally upon the evidence of Dr. Barber, whose testimony in chief shows that he first saw the insured in 1927, when her first child was born. He thought she had a heart leak, but the heart was competent and did not require any treatment. The next time he saw her was in 1930, just before the time of the birth of another child. He then prescribed some heart medicine, not because her heart was incompetent, but in order to prevent it from becoming so under the strain of pregnancy. He next saw her at the hospital between the dates of April 15th and 19th, at which time he performed a therapeutic abortion which he advised because of the added strain of pregnancy which followed closely the birth of the second child, and which might cause some heart damage. Again he saw her August 20, 1932, at which time she gave birth to a normal, living baby. He prescribed heart medicine again, not because her heart was incompetent at the time, but to prevent it from becoming so. Next time he saw her was on May 2, 1935, at which time she called at his office and he prescribed some medicine for her heart. The next treatment was between November 12 and 16, 1936, and was for broken compensation of the heart, and this was the first time he found the heart was incompetent and was not properly taking care of circulation. This was something more than a month after the date of the policy. On February 10, 1937, she went to his office and he gave her medicine for a cough and for her heart. He later advised her that it would be all right for her to make a trip to Chicago to visit relatives. On March 11, 1937, after her return from Chicago, he found her condition unsatisfactory, and he advised her to go to bed, and gave her treatment. He saw her two days later, and he testified: "My notes show that the patient was much better, pulse was slow and regular; the liver swelling had subsided and breathing was O. K."

On cross-examination Dr. Barber testified that the symptoms of the insured were not uncommon as the result of nervousness, and he agreed with the statement of Dr. Milton MacKaye: "Today your cardiologist will tell you that a murmur in a reasonably healthy person is no occasion for drawing up your will. Pulse intermissions may mean nothing at all, except an attack of nervousness." And agreed with the further statement of Dr. MacKaye: "Many current bogies that cold or blue hands, palpitation, pain over the heart, difficulty in drawing a deep breath, do not necessarily mean organic heart trouble. The latter symptom is common among nervous individuals, and, in youth especially, is seldom due to the heart." He also testified that her blood pressure was normal, and that the four principal causes of heart trouble were absent. He also stated that he did not know whether he could fully agree to the further statement of the above authority, that "The nervous system and the ductless glands that control the emotions are likely to be more responsible for circulatory ailments than the heart itself." In answer to the question as to whether she understood and knew what he was treating her for, he answered: "I presume so. I told her that she had a heart leak."

Dr. Donald Angus, the examining physician for the insurer, testified that he made a physical examination and found nothing wrong; that he used the stethoscope to examine her heart and there was no indication of a heart trouble murmur; that he regarded

her as a fair life insurance risk and so reported to the insurance company. In answer to the question in the examination blank: "Have you ever been in a hospital, sanitarium, or other institution for observation, diagnosis, rest or treatment?" he wrote the answer, "No." The doctor said, as he recalled, she said she had not been in any hospital, except to have her baby, and that he did not consider that that affected the insurance risk, and he put down the answer, "No."

The above is a resume of the evidence upon which the verdict and judgment are based. The verdict and judgment are assailed as contrary to, and not supported by, the evidence, and contrary to law. From the foregoing evidence, would the jury be justified in finding that the insured, at the time of making application for the insurance, was afflicted with a serious malady which would affect the insurance risk upon her life, and that the statements in her application were willfully false, fraudulent, misleading, and made in bad faith? It will be noted from the evidence that she never received any treatment for heart ailment until after the insurance policy was issued, although the doctor gave her medicine to strengthen heart action during pregnancy and childbirth. There is nothing in the evidence to indicate that she was suffering from chronic heart disease. She appeared to be in good health and in good physical condition, did her own housework, and never had a physician attend her except at the time of giving birth to her children, and there was nothing unusual about her condition at such times. There is no evidence that she knew or believed that she had heart trouble until after she applied for the insurance policy, and then her condition was not considered by her physician to be serious until after she returned from the visit with relatives in Chicago.

In the case of Washington National Ins. Co. v. Bryant, 183 Okla. 90, 80 P.2d 239, we held:

"Statement in application for insurance that applicant is in good health is an expression of opinion and will not avoid contract if made in good faith without knowledge of latent disease that may actually exist."

Under the second proposition the defendant complains of testimony over the objection of the defendant to the effect that the insured canceled out a $2,000 policy, which she had carried nine years, just prior to taking out the policy sued on. This contention is without merit. Where the motive of the insured in taking out the policy is questioned, the plaintiff is entitled to show any circumstance which tends to disprove bad faith or a fraudulent intent.

We have examined the instructions by the court and find that they fairly state the law of the case.

The question of the falsity of the statements complained of and the intent of the insured in making them being for the jury, and the verdict of the jury being reasonably supported by the evidence, the same will not be disturbed by this court. The judgment of the trial court is affirmed.

BAYLESS, C. J., and HURST, DAVISON, and DANNER, JJ., concur.